UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| HANTZ FINANCIAL SERVICES, INC., and HANTZ GROUP, INC., <br><br> Plaintiffs, <br><br> v. <br><br> NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA, AMERICAN INTERNATIONAL SPECIALTY LINES INSURANCE COMPANY, INC. n/k/a CHARTIS SPECIALTY INSURANCE COMPANY, and AMERICAN INTERNATIONAL GROUP, INC., <br><br> Defendants. | Case No. 13-cv-11197 <br> Honorable Laurie J. Michelson <br> Magistrate Judge David R. Grand |

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION
FOR SUMMARY JUDGMENT [33] AND GRANTING
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [37]**

An employee of Plaintiff Hantz Financial Services, Inc. (a subsidiary of Hantz Group, Inc, (collectively, "Hantz")) stole more than 2.6 million dollars entrusted him by Hantz clients. This insurance coverage dispute concerns whether certain insurance policies issued by Defendants protect Hantz from the losses stemming from this theft. Defendant National Union Fire Insurance Company of Pittsburgh, PA, issued a Financial Institutions Bond ("the Bond") to Hantz for, among other things, "loss resulting directly from dishonest or fraudulent acts committed by an Employee." And Defendant American International Specialty Lines Insurance Company ("AISLIC") issued to Hantz an Errors & Omissions policy ("E&O Policy") that covered losses arising from a claim for "any actual or alleged Wrongful Act of the Insured in rendering or failure to render Professional Services." Each policy has a limit of one million

dollars. Hantz seeks coverage up to the limits of the policies for more than three million dollars in losses. As discussed below, the Court agrees with Defendants that the Bond does not cover Hantz's losses and coverage under the E&O Policy is excluded.

## I. FACTS

From January 2000 until his death in March 2008, Hantz employee Michael Laursen stole more than 2.6 million dollars that Hantz clients gave him to invest or purchase insurance. (Pls.' Mot. Ex. 1, Machcinski Aff. ¶¶ 5, 7, 9.) Between 2000 and 2003, Laursen deposited checks written by clients directly into his personal bank account at Citizens Bank. (*Id.* at ¶ 5.) Most of these checks were written directly to him, but some were made payable to "Hantz Financial Services," "HFS," "Hantz," or "Hantz Consulting." (*Id.*; Pls.' Resp. Ex. 22 at 7.) Laursen also had clients endorse redemption checks they received from mutual funds, for deposit into his personal account. (*Id.*) In December 2003, Laursen opened a commercial checking account at Chemical Bank in the name of "Henary Firearms Service"—later changed to "Henry Firearms Service." (*Id.* at ¶ 6.) He directed Hantz clients to write their checks to "HFS," and deposited them into his account at Chemical Bank. (*Id.*)

Two of Laursen's clients, Brian and Penny Bolton, filed an arbitration claim with the Financial Industry Regulatory Authority ("FINRA") against Hantz, Laursen, and Laursen's supervisor John Bringard on February 20, 2008. (Defs.' Mot. Ex. 10a.) They alleged fraud, negligence, breach of fiduciary duty, and breach of contract. (*Id.* at 11–13.) Hantz received a copy of the claim on March 7, 2008. (Defs.' Mot. Ex. 11h at 3.) On March 9, 2008, before Hantz could obtain any response from Laursen, he committed suicide. (*Id.*) Hantz launched an investigation. (*Id.*)

On March 17, 2008, Hantz notified National Union of a potential claim. (Defs.' Mot. Ex. 11b.) Hantz also notified AISLIC of a potential claim on April 7, 2008. (Defs.' Mot. Ex. 3.) On May 14, 2008, after Hantz obtained documents for Laursen's commercial accounts at Chemical Bank, Hantz filed a claim with National Union on the Bond. (Defs.' Mot. at 11a at Pg ID 840; Pls.' Resp. Ex. 3, Machcinski Aff. ¶ 15.) As part of the claim statements, Hantz disclosed the E&O Policy with AISLIC. (*Id.* at Pg ID 841.) And AISLIC acknowledged on May 22, 2008, that it was evaluating coverage under the E&O Policy. (Pls.' Mot. Ex. 7.)[1]

In all, twenty-three clients were affected by Laursen's thefts. (Pls.' Resp. Ex. 3, Machcinski Aff. ¶ 16.) Clients William and Susan Monroe filed an arbitration claim against Hantz with FINRA for federal securities fraud, violation of the Michigan Securities Act, breach of fiduciary duty and constructive fraud, failure to supervise, respondeat superior, negligence and negligent supervision, and breach of contract. (Pls.' Resp. Ex. 7 at Pg ID 1364.) They were awarded $593,569.97 in a judgment entered on December 17, 2010. (Pls.' Resp. Ex. 8.) Meanwhile, the Boltons settled their arbitration claim on July 24, 2009. (Defs.' Mot. Ex. 11h at 9.) The other clients settled with Hantz directly, without filing any legal action, between May and July 2009. (*See id.*) AISLIC and National Union consented on May 6 and 7, 2009, respectively, to Hantz's proposed settlement of the claims, but they noted that there were coverage issues to be resolved and reserved all rights. (*See* Pls.' Mot. Exs. 13, 14.)

In addition, a regulatory action by FINRA against Hantz and its Chief Compliance Officer Bruce Coleman was resolved in November 2011 by an Acceptance, Waiver and Consent Agreement that included penalties totaling $60,000. (Pls.' Resp. Ex. 11; *see* Pls.' Resp. Ex. 3, Machcinski Aff. ¶ 12.) FINRA had alleged that Hantz "failed to establish, maintain and enforce a

---

[1] National Union and AISLIC are both affiliates of AIG.

3

supervisory system that was reasonably designed to ensure that checks mailed to the firm by its customers were properly accounted for," which "contributed to the firm's failure to detect a fraudulent scheme perpetrated by one of its representatives." (Pls.' Resp. Ex. 11 at 2.)

National Union denied coverage under the Bond on March 17, 2011. (Pls.' Resp. Ex. 32 Denial.) AISLIC has never communicated its position on the claim. (Pls.' Resp. Ex. 3, Machcinski Aff. ¶ 18.) Hantz filed this action on March 18, 2013, for breach of contract and violation of a provision of Michigan's Uniform Trade Practices Act that provides penalty interest for insurance claims not paid on a timely basis.

## II. SUMMARY JUDGMENT STANDARD

Both parties have filed motions for summary judgment. Because Defendants seek summary judgment on claims for which they do not bear the burden of persuasion at trial, they may discharge their initial summary-judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support [Plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If Defendants do so, Plaintiffs "must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of Plaintiffs' claims to a jury, or whether the evidence is so one-sided that Defendants must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to Plaintiffs. *Matsushita*, 475 U.S. at 587.

Plaintiffs' summary-judgment burden is greater. Because they seek summary judgment on claims for which they have the burden of persuasion, Plaintiffs' showing "must be sufficient

4

for the court to hold that no reasonable trier of fact could find other than for plaintiffs." *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986) (quoting W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Genuine Issues of Material Fact*, 99 F.R.D. 465, 487–88 (1984)); *see also Cockrel v. Shelby Cnty. Sch. Dist.*, 270 F.3d 1036, 1056 (6th Cir. 2001) ("[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it.'" (quoting 11 James William Moore et al., *Moore's Federal Practice* § 56.13[1], at 56–138 (3d ed. 2000))). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to Defendants. *Matsushita*, 475 U.S. at 587.

### III. ANALYSIS

Hantz's claims were filed in this Court under its diversity jurisdiction. "[F]ederal courts sitting in diversity 'apply state substantive law and federal procedural law.'" *Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.,* 559 U.S. 393, 417 (2010) (quoting *Hanna v. Plumer,* 380 U.S. 460, 465 (1965)). When deciding issues of substantive law, this Court must apply the law of the state's highest court. *Saab Auto. AB v. Gen. Motors Co.*, 770 F.3d 436, 440 (6th Cir. 2014). If the state's highest court has not decided the applicable law, the state law must be ascertained "'from all relevant data,' which includes the state's appellate court decisions." *Id.* (quoting *Garden City Osteopathic Hosp. v. HBE Corp.,* 55 F.3d 1126, 1130 (6th Cir. 1995)).

The Court addresses the parties' substantive coverage issues first. Because the Court finds that neither the Bond nor the E&O Policy cover Hantz's losses, it is not necessary to

address the parties' arguments about when the losses were discovered or whether Hantz's claims are time-barred under certain contractual limitations.

### A. Direct Loss under the Bond

National Union argues that the Bond does not cover the losses at issue because they were not direct losses. (Mot. at 23–30.) The Bond covers "[l]oss resulting directly from dishonest or fraudulent acts committed by an Employee with the manifest intent: (a) to cause the insured to sustain such loss." (Bond at 1 ¶ A.) It specifically excludes "[i]ndirect or consequential loss of any nature." (Bond at 12 § 2(v).) National Union takes the position that Laursen stole money from Hantz's clients, not from Hantz, and therefore Hantz's liability is indirect, arising only by virtue of its clients' claims against it. In support of this theory, National Union relies on *Tooling, Mfg. & Technologies Ass'n v. Hartford Fire Ins. Co.*, 693 F.3d 665 (6th Cir. 2012).

The plaintiff in that case, Tooling, Manufacturing & Technologies Association (TMTA), was a trade association that facilitated the sale of insurance policies to its members. *Id.* at 668. Because Michigan law did not permit TMTA to collect commissions directly from insurance companies, TMTA created a limited liability company to receive the commissions. *Id.* TMTA was the sole member of the LLC, and received the entire benefit or loss from its operations. *Id.* Like Hantz, TMTA sought coverage under a fidelity bond that covered loss resulting directly from theft by an employee, after discovering that a TMTA employee had redirected to himself commission payments owed to the LLC. *Id.* at 669. In addressing whether TMTA sustained a loss "directly" from the employee's theft from the LLC, the Sixth Circuit noted a split among federal and state courts across the country on whether such language in an insurance policy means "immediate" (the "direct is direct" approach) or "proximate." *Id.* at 674–76 (collecting cases). The dissent argued that the court should follow an unpublished Michigan court of appeals

6

case holding that "[t]he use of the word 'direct' signals 'immediate' or 'proximate' cause, as distinct from remote or incidental causes," *Acorn Inv. Co. v. Michigan Basic Prop. Ins. Ass'n*, No. 284234, 2009 WL 2952677, at *2 (Mich. Ct. App. Sept. 15, 2009). *See Tooling*, 693 F.3d at 680 (Stranch, J., dissenting). But the majority was "convinced that the Michigan Supreme Court would adopt a 'direct is direct' approach were it to consider the issue." *Id.* at 676. Key to the majority's reasoning was that *Acorn* concerned property damage insurance, not an employee fidelity bond, and "the 'result[ed] directly from' language was adopted specifically for employee fidelity policies for a reason—to prevent coverage for third-party losses." *Id.* at 677.

This Court is bound by the holding in *Tooling*. Thus, if Hantz's losses followed "immediate[ly]" from Laursen's conduct, there would be coverage under the Bond. Hantz's characterization of its losses requires the opposite conclusion. As will be discussed further below, Hantz, in seeking coverage under the E&O Policy, argues that its losses derive from third-party claims for negligent supervision. So Hantz acknowledges that the money belonged to its clients, and Hantz's own losses resulted from having to reimburse those clients for Laursen's misappropriation, not from Laursen taking Hantz's money.[2] Thus, if the Court were to find that Hantz's losses were covered by the Bond, it would be finding that an employee fidelity bond covers third-party losses. But *Tooling*'s "direct is direct" approach precludes such a finding.

Hantz argues that *Tooling* is distinguishable because it involved loss sustained by a subsidiary, whereas here "Laursen stole checks directed to HFS." (Pls.' Resp. at 31.) But this contradicts the facts. Even if, absent Laursen's theft, the money would have passed through

---

[2] More specifically, client funds were deposited into (k)(2)(i) accounts which are "special accounts that a broker dealer [like Hantz] sets up for deposit of client funds." (Def. Mot. Sum. J. Ex. 5 at 141.); *see also* 17 C.F.R. § 240.15c3-3(k)(2)(i). Hantz's Senior Vice President of Tax and Business testified that funds in a (k)(2)(i) account are "not in our possession." (Def. Mot. Ex. 6 at 52.)

7

Hantz's hands, there is no question that the money belonged to Hantz's clients. This is demonstrated by Hantz's decision "to offer each claimant a dollar-for-dollar return of their principal investment stolen by Mr. Laursen." (Defs.' Mot. Ex. 11h at 9.) And this conclusion is bolstered by the Bond's requirement that the employee have "the manifest intent: (a) to cause the insured to sustain such loss." (Bond at 1 ¶ A.) Laursen surely intended to cause his clients to lose the money he stole, but no reasonable jury could find that he manifestly intended that Hantz reimburse the clients and thereby sustain a loss. The Court agrees with National Union that the money Hantz paid its clients to reimburse them for Laursen's theft is not a covered loss under the Bond.

Hantz's argument that National Union should be estopped from pursuing this defense because it consented to Hantz's settlement of its clients' claims (Pls.' Reply at 7) is not persuasive. Hantz omits a key sentence when quoting from National Union's letter: "We are okay with the insured settling the various claims that are associated with this loss to mitigate their damages. *The insured must understand that the fidelity bond department has not determined coverage on this claim*." (Pls.' Mot. Ex. 14 (emphasis added).) National Union explicitly warned Hantz that National Union's consent to the settlement should not be read as an indication that the claim would be covered. No reasonable juror could conclude that Hantz justifiably relied on its belief that National Union would not deny coverage. *See McDonald v. Farm Bureau Ins. Co.*, 747 N.W.2d 811, 819 (Mich. 2008) (equitable estoppel applies where defendant's acts or representations induced plaintiff to believe that a limitation on coverage would not be enforced, plaintiff justifiably relied on this belief, and plaintiff was prejudiced as a result).

The Court finds that as a matter of law, Hantz's losses are indirect and thus not covered by the Bond. National Union is therefore entitled to summary judgment on both Hantz's breach of contract claim and its claim for penalty interest under Michigan state law.

**B. Knowledge under the E&O Policy**

The E&O Policy AISLIC issued to Hantz includes an insurance agreement for "Family Office/Wealth Management Professional Liability." (Defs.' Mot. Ex. 2, E&O Policy at 1 § I.) It provides: "This policy shall pay the Loss of an Insured arising from a Claim . . . for any actual or alleged Wrongful Act of the Insured in the rendering or failure to render Professional Services." (*Id.*) AISLIC does not dispute coverage, but argues that an exclusion applies: "[t]he Insurer shall not be liable to make any payment for Loss in connection with a Claim made against an Insured: . . . arising out of . . . any actual or alleged Wrongful Act committed with knowledge that it was a Wrongful Act." (E&O Policy at 8 § 4(II)(b).)

AISLIC says that Laursen's wrongful acts were "committed with knowledge that" they were wrongful acts. (*See* Def.'s Mot. at 34.) The Court agrees. By Hantz's own pleadings, arguments, and statements, Laursen intended to steal the money, and schemed, plotted, and concealed his actions. Laursen clearly had knowledge that his act was wrongful, and so his conduct falls within the ambit of the exclusion.

Hantz attempts to avoid this problem by arguing that the "Wrongful Act" at issue is not Laursen's conduct, but rather, Hantz's alleged negligence in supervising Laursen. That act, says Hantz, was not "committed with knowledge that it was a Wrongful Act." AISLIC responds that this exclusion still applies because Hantz's liability for negligent supervision "arises out of" Laursen's intentional acts. (Defs.' Mot. at 38.)

9

The Court agrees with AISLIC. Michigan courts interpret "arising out of" broadly. In *McKusick v. Travelers Indem. Co.*, 632 N.W.2d 525 (Mich. Ct. App. 2001), a commercial general liability insurance policy excluded claims "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants." *Id.* at 529. The insured argued the exclusion did not apply because "their injuries occurred when they were attempting to clean up the [pollutant] spill, not during the initial spill." *Id.* at 532. The court reasoned:

> While the term "arising out of" does not appear to have been defined in the context of a CGL policy, it has been interpreted in the areas of worker's compensation and automobile insurance law. To establish that an injury arose out of employment, the employee must illustrate that the injury occurred "as a circumstance of or incident to the employment relationship." *MacDonald v. Michigan Bell Telephone Co.*, 132 Mich. App. 688, 692, 348 N.W.2d 12 (1984). To establish that an injury arose out of an automobile accident, the claimant must illustrate a causal connection that is more than incidental, fortuitous, or remote between the use of the motor vehicle and the injury. *Jones v. Tronex Chemical Corp.*, 129 Mich. App. 188, 192, 341 N.W.2d 469 (1983), quoting *DAIIE v. Higginbotham*, 95 Mich. App. 213, 222, 290 N.W.2d 414 (1980). In this case, both the chemical release and plaintiffs' injuries have significantly more than a remote connection to [the pollutant].

*Id.*; *see also Lafarge Midwest, Inc. v. Frankenmuth Mut. Ins. Co.*, No. 253591, 2005 WL 1923158, at *2 (Mich. Ct. App. Aug. 11, 2005) ("the phrase 'arising out of . . .' is expansive"); *Assurance Co. of Am. v. J.P. Structures, Inc.*, 132 F.3d 32 (table), 1997 WL 764498, at *5 (6th Cir. 1997) ("[T]he term 'arising out of' is 'ordinarily understood to mean 'originating from' 'having its origin in,' 'growing out of' or 'flowing from' or in short, 'incident to or having a connection with.'"). Hantz's liability for negligent supervision has "significantly more than a remote connection to" Laursen's intentional acts. It appears that Michigan courts would find the claim "arises out of" Laursen's intentional acts, therefore, and this Court must follow suit.

Persuasive case law also supports this interpretation. For example, in *Westport Resources Investment Services, Inc. v. Chubb Custom Insurance Co.*, relying on New York law, the Second

10

Circuit affirmed the district court's rejection of an argument like Hantz's here. 110 F. App'x 172, 174–75 (2d Cir. 2004). The professional indemnity insurance policy at issue contained an exclusion for "[c]laims based on or directly or indirectly arising out of or resulting from, in whole or in part, an Insured's commission of . . .any . . . criminal act." *Id.* at 174. The insured, Westport, argued the exclusion did not apply to its claims based on negligent failure to supervise and monitor its employee who operated a fraudulent investment scheme. *Id.* The appeals court concluded that "the underlying claims against Westport are 'based on' and directly 'aris[e] out' of" the employee's criminal conduct. *Id.* The court declined to "give Westport insurance that it never purchased, namely, coverage for the criminal acts of its representative." *Id.* at 174–75. The exclusionary language in this case is even broader than that in *Westport* because here it is not limited to claims arising out of *an insured's* wrongful act—it is "*any* actual or alleged Wrongful Act."

In *Continental Casualty Co. v. H.S.I. Financial Services, Inc.*, the Georgia Supreme Court applied an exclusion for "[a]ny claim arising out of any dishonest, fraudulent, criminal, or malicious act by [an insured] or any of [an insured's] partners, officers, stockholders, or employees dishonest, fraudulent, criminal and malicious act[s]." 466 S.E.2d 4, 5 (Ga. 1996). The court first found that the provision clearly excluded claims for a law firm partner's theft of escrowed funds. *Id.* at 6. The court then rejected the argument that claims against other partners for their negligent failure to supervise asserted "independent and concurrent causes" of the law firm's loss. *Id.* The court reasoned that "the exclusionary clause is not at all concerned with whether ancillary acts of less culpable partners may have contributed to the loss," but "by its express terms, the exclusionary clause is focused solely upon the genesis of" the claims. *Id.*

Thus, "the fact that [the other partners] may have negligently allowed [one partner] to perpetuate his theft . . . does not negate the plain effect of the policy's exclusionary clause." *Id.*

As another court facing this issue has noted, Hantz's "argument would effectively eliminate the exclusion because whenever an employee commits a dishonest/criminal act, allegations framed in negligence can always be claimed against the employee's superiors. *Stouffer & Knight v. Continental Cas. Co.*, 982 P.2d 105, 111 (Wash. Ct. App. 1999). Coverage for Hantz's claim is thus excluded by Exclusion 4(II)(b).

Even if the claim arises out of two Wrongful Acts—Laursen's theft *and* Hantz's negligent supervision—the exclusion still applies. As the Sixth Circuit has explained, "[T]he default rule under Michigan law is that a loss is *not* covered when it is concurrently caused by the combination of a covered cause and an excluded cause." *Iroquois on the Beach, Inc. v. Gen. Star Indem. Co.*, 550 F.3d 585, 588 (6th Cir. 2008) (emphasis in the original) (holding that an exclusion applied despite a covered cause "set[ting] in motion the chain of events leading to the loss") (citing *Vanguard Ins. Co. v. Clarke*, 475 N.W.2d 48, 53 (1991), *overruled in part on other grounds by Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 785-87 (2003)). Here, the plain language of the exclusion is broad. It excludes losses in connection with claims against an insured "alleging, arising out of, based upon or attributable to any actual or alleged Wrongful Act committed with knowledge that it was a Wrongful Act." (E&O Policy at 8 § 4(II)(b).) Because the parties do not dispute that Laursen knew that his theft was wrongful, the only issue is whether Hantz's losses are "in connection with a Claim made against an insured . . . alleging, arising out of, based upon or attributable to" Laursen's theft. The losses clearly were. Granted, the losses may have also arisen out of Hantz's negligent supervision, and if that had been the only cause of Hantz's loss, the exclusion for Wrongful Acts committed with knowledge would

12

not apply. But because the loss was "concurrently caused by the combination of a covered cause [negligent supervision] and an excluded cause [Laursen's theft]," the exclusion trumps. *See Iroquois*, 550 F.3d at 588.

Hantz also argues that language in exclusion 4(II)(a) prevents the application of exclusion 4(II)(b) here. (Pls.' Resp. at 33–35.) Exclusion 4(II)(a), which deals with profits made from the sale or purchase of securities or payments made without stockholder approval, states that "[t]he Wrongful Act of an Insured shall not be imputed to any other Insured for the purpose of determining the applicability of the foregoing exclusion II. (a)." (E&O Policy at 8 § 4(II)(a).) Both by its unambiguous terms and its placement, this language applies only to exclusion 4(II)(a). Hantz's attempt to incorporate it into exclusion 4(II)(b) is contrary to Michigan case law, under which "exclusions are not to be read cumulatively, but individually." *Hawkeye-Sec. Ins. Co. v. Vector Const. Co.*, 460 N.W.2d 329, 337 (1990) (rejecting insured's argument that "the exception to exclusion (a), when read together with exclusions (n) and (o), creates an ambiguity in the insurance contract which must be construed in favor of coverage"); *see also Transp. Ins. Co. v. Valentine Investments, L.L.C., Inc.*, 205 F. App'x 362, 365 (6th Cir. 2006) ("GuideOne's other arguments, that the two exclusions are really a single exclusion, that they should be read as a harmonious whole, and that the hostile fire exception would be negated by the district court's interpretation, are all contravened by Michigan law."); *English v. Blue Cross Blue Shield*, 688 N.W.2d 523, 537 (Mich. Ct. App. 2004) ("Exclusions limit the scope of coverage provided and are to be read with the insuring agreement and independently of every other exclusion.").

13

The Court finds that as a matter of law, Hantz's losses are excluded by the E&O Policy. AISLIC is therefore entitled to summary judgment on both Hantz's breach of contract claim and its claim for penalty interest under Michigan state law.

## IV. CONCLUSION

National Union and AISLIC did not assume the risk of Hantz's losses in this case, as a matter of law. The Court therefore GRANTS Defendants' Motion for Summary Judgment (Dkt. 37) and DENIES Plaintiffs' Motion for Summary Judgment (Dkt. 33), as to all claims. Plaintiffs' Motion for Leave to File Supplemental Affidavit of John Machcinski (Dkt. 48) is DISMISSED AS MOOT. A separate judgment will be entered, and the case closed.

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

Dated:  September 17, 2015

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 17, 2015.

s/Jane Johnson
Case Manager to
Honorable Laurie J. Michelson